# 25-1626-cv

# United States Court of Appeals

*for the*

# Second Circuit

In Re: Application of Yulia Guryeva-Motlokhov
for an Order Seeking Discovery Pursuant to 28 U.S.C. § 1782

YULIA GURYEVA-MOTLOKHOV,

*Claimant-Appellant*,

– v. –

GASTON ALPHONSO BROWNE, DARWIN TELEMAQUE, GASTON
ANDRON BROWNE III, MARIA BIRD-BROWNE, HYACINTH HARRIS,
ICKFORD ROBERTS, IF ANTIGUA, INC., FARMER DG BROWNE CO.
LIMITED, COVE HEAD DEVELOPMENT LIMITED, COVE HEAD
COMMUNICATIONS LIMITED, WEST INDIES OIL COMPANY,

*Intervenors-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, CASE NO. 1:25-MC-00098

## BRIEF AND SPECIAL APPENDIX
## FOR CLAIMANT-APPELLANT

EMILIANO MARTIN DE LUCA
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, New York 10001
(212) 446-2300

DARIA PUSTILNIK
BOIES SCHILLER FLEXNER LLP
100 SE Second Street, Suite 2800
Miami, Florida 33131
(305) 539-8400

DAN BOYLE
TATIANA NIKOLAEVA
BOIES SCHILLER FLEXNER LLP
2029 Century Park East, Ste. 1520
Los Angeles, California 90067
(213) 995-5732

*Attorneys for Claimant-Appellant*

 COUNSEL PRESS    (800) 4-APPEAL • (385964)

## CORPORATE DISCLOSURE STATEMENT

Claimant-Appellant Yulia Guryeva-Motlokhov is an individual and thus falls outside Rule 26.1.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT.................................................i

TABLE OF AUTHORITIES.................................................................iv

STATEMENT REGARDING ORAL ARGUMENT...................................1

STATEMENT OF JURISDICTION.......................................................2

STATEMENT OF ISSUES....................................................................3

INTRODUCTION...............................................................................5

STATEMENT OF THE CASE...............................................................8

    I.    The Underlying Dispute and Related Foreign Proceedings....................................................................9

        A.    Misappropriation of the *Alfa Nero*................................9

        B.    The Antiguan Proceedings............................................13

        C.    The Contemplated Emirati Proceedings........................16

    II.    The Section 1782 Application.............................................16

    III.    The Motions to Quash........................................................18

    IV.    The District Court's Order Quashing the Subpoenas..........19

STANDARD OF REVIEW....................................................................20

SUMMARY OF THE ARGUMENT.......................................................21

ARGUMENT......................................................................................26

    I.    The District Court Erred In Quashing The Subpoenas In Their Entirety Because Appellees Had No Standing To Seek Relief For Non-Appearing Targets Of The Subpoenas...............................................................26

        A.    Appellees Lack Standing To Challenge The Subpoenas On Behalf Of Other Subpoena Targets.............................................................................27

B. Even If The District Court Could Quash The Subpoenas In Their Entirety, It Should Have Conducted A Target-By-Target Inquiry ...................... 30

II. The District Court Erred In Finding That The Antiguan Proceedings Did Not Satisfy The Statutory "For Use" Requirement ......................................................... 32

A. The Appellate Stage Of Already-Pending Proceedings In Antigua Is Not A Separate, Contemplated Proceeding .............................................. 37

B. Even If The Appellate Stage Of The Antiguan Proceedings Is A Separate, Contemplated Proceeding, The District Court Applied The Standard Incorrectly .................................................... 43

III. The District Court Applied An Erroneous Standard In Determining Whether The Contemplated Emirati Proceedings Were "Within Reasonable Contemplation" ................................................................... 47

CONCLUSION ................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*,
747 F.3d 1262 (11th Cir. 2014) ........................................................... 58

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
673 F.3d 76 (2d Cir. 2012) ................................................. 34, 35, 39, 42

*Certain Funds, Accts. &/or Inv. Vehicles v. KPMG, LLP*,
798 F.3d 113 (2d Cir. 2015) ...................................................... *passim*

*Dannacher v. Cloudflare*, Inc.,
2024 WL 2875097 (N.D.Cal., 2024) ..................................................... 37

*Diamond v. Charles*,
476 U.S. 54 (1986) ..................................................................... 27

*Doe v. Hochul*,
139 F.4th 165 (2d Cir. 2025) .......................................................... 21

*Estate of Ungar v. Palestinian Auth.*,
400 F. Supp. 2d 541 (S.D.N.Y. 2005) ................................................... 28

*Euromepa S.A. v. R. Esmerian, Inc.*,
51 F.3d 1095 (2d Cir. 1995) ........................................................ 39, 46

*Euromepa, S.A. v. R. Esmerian, Inc.*,
154 F.3d 24 (2d Cir. 1998) ............................................................ 34

*Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*,
27 F.4th 136 (2d Cir. 2022) ........................................................... 20

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) ................................................................... 27

*IJK Palm LLC v. Anholt Servs. USA, Inc.*,
33 F.4th 669 (2d Cir. 2022) ..................................................... *passim*

*In re Accent Delight Int'l Ltd.*,
869 F.3d 121 (2d Cir. 2017) ..................................................... *passim*

*In re Application for an Ord. Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proc. ("Berlamont"),*
773 F.3d 456 (2d Cir. 2014) ........................................................51, 52

*In re Application of Sarrio, S.A.,*
119 F.3d 143 (2d Cir. 1997) .................................................................26

*In re Application of Shervin Pishevar for an Ord. to take Discovery for use in Foreign Proc. Pursuant to 28 U.S.C. § 1782,*
439 F. Supp. 3d 290 (S.D.N.Y. 2020) ...............................................44-45

*In re B&C Kb Holding GmbH,*
No. 23-1014, 2024 WL 3170983 (2d Cir. June 26, 2024) ....................56

*In re BonSens.org,*
95 F.4th 75 (2d Cir. 2024) ...........................................................*passim*

*In re Bouka,*
654 F. Supp. 3d 283 (S.D.N.Y. 2023) ..................................................43

*In re Bourlakova,*
No. 24-3187-CV, 2025 WL 1733495 (2d Cir. June 23, 2025) ...............21

*In re Byrne,*
2023 WL 3203811 (S.D.N.Y., 2023) .............................................37, 46

*In re Ex Parte Application of Kleimar N.V.,*
220 F. Supp. 3d 517 (S.D.N.Y. 2016) ..................................................27

*In re Furstenberg Fin. SAS,*
2018 WL 3392882 (S.D.N.Y. July 12, 2018) .......................................45

*In re Gaston Browne Corruption Discovery Application,*
Case No. 25-CV-21129-MOORE/Elfenbein,
2025 U.S. Dist. LEXIS 136063 (S.D. Fla. Jul. 16, 2025) ....................17

*In re Guryeva-Motlokhov,*
2025 WL 1581762 (S.D.N.Y. June 4, 2025) ...........................................9

*In re Kleimar N.V v. Benxi Iron & Steel Am., Ltd.,*
No. 17-CV-01287, 2017 WL 3386115 (N.D. Ill. Aug. 7, 2017) ............28

*In re Malev Hungarian Airlines,*
964 F.2d 97 (2d Cir. 1992)...................................................................41

v

*In re Metallgesellschaft AG,*
  121 F.3d 77 (2d Cir. 1997) .................................................................. 33

*In re Pishevar,*
  2020 WL 1862586 (S.D.N.Y. Apr. 14, 2020) ....................................... 46

*In re Request of Susan Devine for Jud. Assistance pursuant to 28 U.S.C.*
  *§ 1782 for the Liechtenstein Pr*incely Ct.,
  No. 22-MC-133 (VSB), 2022 WL 1658586 (S.D.N.Y. May 25, 2022) ... 26

*In re Saul Klein,*
  No. 23 MISC. 211 (PAE),
  2023 WL 8827847 (S.D.N.Y. Dec. 21, 2023) ............................... *passim*

*Intel Corp. v. Advanced Micro Devices, Inc.,*
  542 U.S. 241 (2004) ................................................................... *passim*

*Kiobel by Samkalden v. Cravath, Swaine & Moore LLP,*
  895 F.3d 238 (2d Cir. 2018) .......................................................... 20-21

*Klein v. Altara RK Invs. Ltd.,*
  No. 24-228-CV, 2025 WL 560105 (2d Cir. Feb. 20, 2025) ................... 50

*Langford v. Chrysler Motors Corp.,*
  513 F.2d 1121 (2d Cir. 1975) ........................................................ 27, 29

*Mangouras v. Squire Patton Boggs,*
  980 F.3d 88 (2d Cir. 2020) ............................................................ 35, 58

*Mees v. Buiter,*
  793 F.3d 291 (2d Cir. 2015) .......................................................... *passim*

*Mussington v. Deborah Brosnan & Assocs., LLC,*
  708 F. Supp. 3d 1 (D.D.C. 2023) .................................................... 37, 42

*Shain v. Ellison,*
  356 F.3d 211 (2d Cir. 2004) .............................................................. 21

*Torcivia v. Suffolk Cnty.,*
  17 F.4th 342 (2d Cir. 2021) ............................................................... 26

*Town of Chester, v. Laroe Ests., Inc.,*
  581 U.S. 433 (2017) ......................................................................... 28

vi

*United States v. City of New York,*
198 F.3d 360 (2d Cir. 1999) ................................................................. 29

**Statutes & Other Authorities:**

28 U.S.C. § 1291 ................................................................................. 2

28 U.S.C. § 1331 ................................................................................. 2

28 U.S.C. § 1782 ........................................................................ *passim*

28 U.S.C. § 1782(a) ........................................................ 51, 53, 55, 57

## STATEMENT REGARDING ORAL ARGUMENT

This case raises three matters of apparent first impression in this Circuit: (1) whether a target of a subpoena granted under 28 U.S.C. § 1782 may quash such a subpoena even as to targets who did not appear and did not seek any relief from the district court; (2) whether trial and appellate stages of the same case within a foreign court system constitute a single foreign proceeding under 28 U.S.C. § 1782; and (3) if they do not constitute the same foreign proceeding under 28 U.S.C. § 1782, whether an applicant for discovery under 28 U.S.C. § 1782 must prove that she will not win on all appealable issues in the trial proceedings to show that an appeal is "within reasonable contemplation." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004). At the time of this filing, no other Court of Appeals appears to have addressed these questions. Because oral argument would aid the court in resolving these important issues, Claimant-Appellant Yulia Guryeva-Motlokhov accordingly requests oral argument.

1

## STATEMENT OF JURISDICTION

Appellant filed an application to conduct discovery in aid of foreign proceedings under 28 U.S.C. § 1782. The District Court exercised federal-question jurisdiction under 28 U.S.C. § 1331.

The District Court denied Appellant's application on June 4, 2025. JA567–68; SA9–10. Appellant timely filed her notice of appeal on July 1, 2025. JA569–570. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Appellees are the Prime Minster of Antigua and Barbuda and associated Antiguan political operatives who orchestrated a corrupt scheme to misappropriate a multi-million dollar vessel when it docked at a port in Antigua. Through multiple foreign proceedings, both pending and contemplated, Appellant, the beneficial owner of the vessel through a trust structure, has sought to invalidate the sham sale of the vessel and to hold certain of the Appellees and their co-conspirators accountable for violating her rights and liable for nine-figure damages.

To aid these proceedings, Appellant brought an application for discovery under Section 1782 seeking to obtain financial records corroborating the corrupt scheme surrounding the seizure and covert sale of the yacht. The District Court initially granted Appellant's application but later reconsidered its order after some, but not all, of the subpoena targets moved to quash the subpoenas. The District Court quashed the subpoenas in their entirety, finding that Appellant failed to satisfy Section 1782's "for use" requirement. The issues on appeal are:

1. Whether a target of a subpoena granted under Section 1782 may quash such a subpoena even as to those subpoena targets who did not

appear and did not seek any relief from the district court. If so, whether the district court must make a target-by-target determination that the statutory requirements are not met as to each target.

2. Whether the trial and appellate stages of the same case within the same foreign court system constitute a single foreign proceeding within the meaning of Section 1782. If they do not, whether an applicant for discovery under Section 1782 must prove that she will not prevail on all appealable issues in the trial proceedings to show that the appeal is "within reasonable contemplation."

3. Whether the "for use" requirement of Section 1782 is satisfied when a petitioner intends to use requested discovery as evidence to support a criminal complaint which would trigger a foreign prosecutorial authority's duty to investigate and determine whether to initiate a formal criminal prosecution.

## INTRODUCTION

Three and a half years ago, the superyacht *Alfa Nero* docked at an Antiguan port. This marked *Alfa Nero's* last voyage under its rightful ownership. Once in port, the yacht was detained by Antiguan authorities without explanation, held in limbo for months under the pretext that it was 'abandoned,' and ultimately sold in a covert and below-market sale. Appellant Yulia Guryeva-Motlokhov, the *Alfa Nero*'s beneficial owner through a series of trusts, sought justice anywhere she could—from Antiguan courts, to the civil courts of the Russian Federation, to the prosecutorial offices of the United Arab Emirates. She retained private investigators, who identified the secret buyer of the yacht (which was not disclosed by Antiguan authorities), and how much the Antiguan Prime Minister reportedly received as a bribe for orchestrating the transfer of *Alfa Nero* at a price far below market. During their investigation, Applicant's investigators also uncovered reports of wide-ranging corruption and illegal activity within the administration of Antiguan Prime Minister Gaston Browne, well above and beyond the seizure and sale of the *Alfa Nero*.

Appellant filed an application under Section 1782 seeking evidence from two wire-transfer clearinghouses that would corroborate the reports received by her investigators about corruption in Browne's administration, and explained that she intended to present this evidence to three foreign tribunals in which she either had initiated, or intended to initiate, proceedings concerning the misappropriation of the *Alfa Nero*. At first, the District Court granted the application and issued subpoenas to two clearinghouses. But after Prime Minister Browne and several other targets of the subpoenas intervened to quash them, the District Court granted their motions and quashed the subpoenas *in their entirety*.

The District Court made three serious errors in doing so. *First*, the District Court quashed the subpoenas in *toto*, even though the intervenors lacked standing to seek relief on behalf of non-appearing parties. *Second*, the District Court held that the requested discovery was not "for use" in the Antiguan Proceedings unless Appellant demonstrated that she would inevitably lose her case in the Antiguan trial court—a showing no litigant should be ordered to make and one Section 1782 does not require. *Finally*, the District Court considered only the hurdles Appellant would face in lodging a formal criminal complaint against

6

Prime Minister Browne in the United Arab Emirates, while failing to consider whether Applicant had pled facts showing that such hurdles were likely to be overcome. In doing so, the District Court also failed to consider that a criminal investigation by the Emirati prosecutorial office itself qualifies as a foreign proceeding under 28 U.S.C. § 1782. Each of these errors, independently, warrants reversal.

## STATEMENT OF THE CASE

On March 11, 2025, Appellant filed an *ex parte* application under 28 U.S.C. § 1782 ("Application") to conduct discovery to aid three foreign proceedings[1] she had either initiated or intended to initiate against parties responsible for the misappropriation of the *Alfa Nero*. *See generally* JA11–14; *see also* JA54. United States District Court Judge Jesse M. Furman initially granted the Application (JA343–45), and Appellant served the court-authorized subpoenas on the intended recipients ("Subpoenas").

On April 11, 2025, Intervenor-Appellees Gaston Alphonso Browne ("Browne"), Maria Bird-Browne, Gaston Andron Browne III, Hyacinth Harris, Darwin Telemaque ("Telemaque"), Ickford Roberts, IF Antigua Inc., Farmer DG Browne Co. Limited, Cove Head Development Limited, and Cove Head Communications Limited (collectively the "Antiguan Parties") moved to intervene and quash the Subpoenas ("Antiguan Motion to Quash"). *See* JA346. The same day, Intervenor-Appellee West Indies Oil Company ("WIOC") moved to intervene and quash the

[1] The proceedings in the Russian Federation are not at issue on this appeal.

Subpoenas ("WIOC Motion to Quash"). *See* JA396. Appellant did not oppose the Antiguan Parties' and WIOC's (collectively, "Appellees") interventions, but she opposed their requests to quash the Subpoenas and reconsider the District Court's order granting the Application. *See generally* JA476–505.

District Court Judge Jesse M. Furman considered the Antiguan Motion to Quash and the WIOC Motion to Quash together and granted them, finding that the Application did not satisfy the statutory "for use" requirement of 28 U.S.C. § 1782 ("Section 1782"). *See* JA567–68; SA9–10; *see also In re Guryeva-Motlokhov*, 2025 WL 1581762, at *5 (S.D.N.Y. June 4, 2025). This appeal followed. *See* JA569–70.

## I. The Underlying Dispute and Related Foreign Proceedings

### A. Misappropriation of the *Alfa Nero*

The *Alfa Nero* is a luxury yacht valued at approximately $100 million and holding over $200,000 worth of art onboard. JA133 ¶ 83. Before its misappropriation, the *Alfa Nero* was in Appellant's beneficial control, although as with many high-value assets, the *Alfa Nero* belonged

to Appellant through a series of holding companies and trusts.[2] *See* JA78.

Around March 2022, the *Alfa Nero* arrived at Falmouth Harbour, Antigua. JA145 ¶ 3. There, without explanation, the Antiguan government detained the vessel. JA21–22; *see also* JA78.

Months later, on August 2, 2022, the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") sanctioned Andrey Guryev, Appellant's father, and designated the *Alfa Nero* as "blocked property." JA22, 78. OFAC did not sanction Appellant at that time or at any time thereafter.

Following the designation of the *Alfa Nero*, the Antiguan government formally detained the vessel. JA78–79. Despite the repeated requests by Appellant's representatives to return the *Alfa Nero*, the Antiguan government announced that it intended to proceed with a sale of the vessel. JA79–80. To empower itself to do so, the Antiguan government then enacted a new law—the Port Authority Amendment Act. JA79, 299 ¶ 29, 146 ¶ 7.2.

---

[2] Specifically, it belonged to the Flying Dutchman Ltd., a company incorporated in British Virgin Islands ("BVI") and controlled by the Tyne Trust. JA78. The onboard art belonged to another BVI-incorporated company, Vita Felice Ltd., controlled by the Flagstaff Trust. *Id.* Appellant is a sole adult beneficiary of the Tyne Trust and Flagstaff Trust. *Id.*

According to this brand new law, the port manager (Appellee Telemaque), published a notice requiring an owner of the *Alfa Nero* to remove the vessel from the harbor or risk a forced sale—which was plainly impossible, because the Antiguan government was at the same time preventing Appellant and her representatives from complying with these demands. JA79, 90–91. Appellant attempted to judicially enjoin the sale, as detailed below, but her attempts were unsuccessful. *See* JA94–98, 142 ¶ 114.

In June 2023, OFAC lifted sanctions against the *Alfa Nero* at the request of the Antiguan government. JA91 ¶ 54, 22–23. Before the sanctions were lifted, however, Browne was already negotiating the sale of the *Alfa Nero* with at least one buyer, but U.S. banks had blocked a $10 million "down payment." JA295–96 ¶ 12. Once the sanctions were lifted, the sale proceeded through a public auction. JA26–27. The auction process was marred by irregularities, including the Antiguan government's failure to follow the legally mandated auction procedures and Antiguan Prime Minister Browne's inexplicable personal involvement in the process. JA145–46, 148 ¶ 15, 296–97 ¶¶ 15–16. To top it off, the Antiguan government disqualified 24 out of 27. JA296–97 ¶ 16.

Ultimately, the highest "qualified" bidder withdrew his bid. JA26, 145–46 ¶ 7. The runner-up bidder filed a lawsuit to enforce the auction results but also ultimately abandoned the purchase of the *Alfa Nero* and sought over $5 million in damages he purportedly incurred in reliance on the auction procedures. *See generally* JA144–50. As a part of this proceeding, Appellee Telemaque submitted an affidavit stating that he was unable to deliver clear title to the highest bidder "due to several claims pending before the court involving the vessel." *See* JA147 ¶ 10.

A year later, without any subsequent auction or even public notice, and despite its admission that the pending claims prevented the transfer of the vessel's clear title to the vessel, the Antiguan government sold the *Alfa Nero* to an anonymous buyer in a private sale. JA297 ¶¶ 18–22. The secret sale was yet again led by Browne and took only ten days from beginning to end. *Id*.

Official sales records, if they ever existed, subsequently disappeared from the Antiguan Finance Ministry (JA300 ¶¶ 32–34), but

it was widely reported that the buyer managed to acquire the $100 million superyacht *Alfa Nero* for just $40 million. JA297 ¶¶ 19–21.

Appellant's investigators were subsequently informed that the then-anonymous buyer paid as much as fifty or even sixty million dollars in total, with the difference paid to Browne through associates as a "finder's fee." JA298 ¶¶ 25–27.

### B. The Antiguan Proceedings

<u>Preliminary Injunction Stage</u>. After unsuccessful attempts to discuss the yacht's removal with Telemaque, Appellant, through the *Alfa Nero's* holding companies, sued in the Eastern Caribbean Supreme Court, Antigua and Barbuda ("Antiguan Trial Court"), seeking a preliminary injunction to prevent the sale of the vessel and leave to apply for judicial review of the decisions to seize and to sell the *Alfa Nero*. JA77, 80. The Antiguan Trial Court granted leave, allowing Appellant to challenge the constitutionality and procedural fairness of the seizure and forced sale, but denied a preliminary injunction. JA89–91, 93 ¶ 66, 94–98. Appellant appealed the denial of the preliminary injunction to the Court of Appeal of the Eastern Caribbean Supreme Court ("Antiguan Appellate Court"). JA100–01. The Antiguan government cross-appealed

13

the grant of leave to challenge their decisions to seize and sell the *Alfa Nero*. JA101. The Antiguan Appellate Court affirmed the Antiguan Trial Court's decision in full, rejecting arguments of both Appellant and the Antiguan government. JA142 ¶ 114.

Trial Stage. Appellant's constitutional claim against Appellee Telemaque, the Director of the Antigua and Barbuda Department of Marine Services and Merchant Shipping, and the Attorney General proceeded to a bench trial in late 2024. JA324–25 ¶ 8; AJ359. To date, the Antiguan Trial Court has not issued a judgment. JA325 ¶ 9.

Appellate Stage. Once the judgement is rendered, either party may appeal and may adduce additional evidence if (i) "the evidence could not have been obtained with reasonable diligence for use at the trial in the lower court," (ii) "the evidence, if given, would have an important influence on the result of the case (though it need not be decisive)," and (iii) "the evidence [is] credible (though it need not be incontrovertible)." JA325–26 ¶¶ 11–14.

Appellant submitted evidence that she intends to appeal the judgement, if it is unfavorable, to the Antiguan Appellate Court and, if necessary to "the Judicial Committee of the Privy Council in London,

14

which serves as the highest court of appeal for matters of this type." JA325 ¶ 10. Further, according to the unrebutted declaration of Appellant's counsel and expert in British law, Appellant has good prospects of persuading the Antiguan Appellate Court to admit and review discovery Appellant obtains under Section 1782. JA325–26 ¶¶ 10–17.

As Appellant's legal expert explained, one of the key issues in the Antiguan Proceedings is whether the taking of the *Alfa Nero* was constitutional. JA327–29 ¶ 20. Article 9 of the Constitution of Antigua and Barbuda prohibits compulsory taking of property unless certain exceptions apply. JA327–28 ¶ 20(a)–(c). The exceptions do not apply if the taking "is shown not to be reasonably justifiable in a democratic society." JA328 ¶ 20(c). Under the leading case on the issue, this inquiry turns on three questions: whether: "(i) the legislative objective is sufficiently important to justify limiting a fundamental right; (ii) the measures designed to meet the legislative objective are rationally connected to it; and (iii) the means used to impair the right or freedom are no more than is necessary to accomplish the objective." JA328 ¶ 20(d)–(e). If the legislative objective was to profit individual members

15

of the Antiguan government, the taking of the *Alfa Nero* would be unconstitutional. JA328–29 ¶ 20(f).

### C. The Contemplated Emirati Proceedings

Appellant is a resident of the United Arab Emirates ("UAE"). JA332 ¶ 6. As a resident, Appellant is entitled to the UAE's protection for crimes committed against her abroad. JA337–38 ¶ 8. Appellant can and intends to initiate criminal proceedings against Browne, and potentially others, under the UAE Penal Code, as detailed in the declaration of her Emirati counsel ("Contemplated Emirati Proceedings"). *See generally* JA336–40; *see also* JA337–38 ¶¶ 8–10. The Contemplated Emirati Proceedings will seek to hold Browne criminally liable for misappropriating the *Alfa Nero* and for hiding proceeds of the sale. JA338 ¶ 9.

To initiate criminal proceedings, Appellant must file a petition with the UAE Federal Public Prosecution with such evidence as she can obtain in support of her allegations. JA337–38 ¶ 8.

### II.   The Section 1782 Application

Once Appellant's investigation uncovered Browne's involvement (and possibly leading role) in the orchestrated misappropriation of the *Alfa Nero*, she filed two applications for discovery under Section 1782.

16

The applications sought to obtain corroborating evidence of Browne's involvement and the movement of the sale proceeds to prove the identities of Browne's co-conspirators for use in the above proceedings. *See generally* JA16–69. Only the Application filed in the Southern District of New York is at issue.[3]

In the Application, Appellant sought to obtain discovery from The Clearing House Payments Company LLC and The Federal Reserve Bank of New York, two wire transfer clearinghouse that handle U.S.-dollar-denominated transfers between domestic and international banks ("Requested Discovery"). JA55. Appellant requested records of transactions involving Browne and six other individuals who the investigation revealed were likely connected to Browne's finances and/or the fraudulent scheme to misappropriate the *Alfa Nero*: the Antiguan Parties and Alkiviades David, an associate of Browne. *See* JA275. Appellant also requested records of financial transactions related to

---

[3] The second application, filed in the Southern District of Florida, sought the sales records from a Florida-based broker who assisted with the sale of the *Alfa Nero. See generally* JA282–92. This application has been granted and remains unchallenged. *See In re Gaston Browne Corruption Discovery Application*, Case No. 25-CV-21129-MOORE/Elfenbein, 2025 U.S. Dist. LEXIS 136063, *18 (S.D. Fla. Jul. 16, 2025).

17

Browne and the sale involving twelve other entities, including Appellees WIOC, IF Antigua Inc., Farmer DG Browne Co. Limited, Cove Head Development Limited, and Cove Head Communications Limited. *See* JA275–76.

Appellant submitted declarations of her British and Emirati counsel explaining how the Requested Discovery was relevant to, and could be used in, the existing Antiguan Proceedings and in support of the Contemplated Emirati Proceedings. *See generally* JA323–30, 336–40.

The District Court granted the Application on March 17, 2025. *See generally* JA341–42. As relevant to this appeal, the District Court found "that Section 1782's statutory requirements are met and that the so-called *Intel* factors favor granting the Application." JA341.

## III. The Motions to Quash

On April 11, 2025, the Antiguan Parties and WIOC moved to intervene, to vacate the District Court's March 17, 2025 order, and to quash the Subpoenas (collectively "Motions to Quash"). *See* JA346, 396. The remaining targets of the subpoenas did not appear and did not seek

18

any relief from the District Court.[4] Appellant did not oppose intervention, but otherwise opposed both motions. *See* JA476–505.

## IV.     The District Court's Order Quashing the Subpoenas

On June 4, 2025, the District Court granted the Motions to Quash. *See* JA567–68; SA9–10. The District Court held that the Application did not satisfy the statutory "for use" requirement. JA562; SA4. The District Court also held that, although not all the targets intervened, the Subpoenas should be quashed in their entirety because the Application did not meet the statutory "for use" requirement and therefore "it would be inappropriate to allow the subpoenas to stand at all." JA567; SA9.

With respect to the Antiguan Proceedings, and as relevant here, the District Court held that Appellant did not "identify any procedural mechanism to 'inject' the requested discovery into those proceedings at this time — or any time in the near future." JA563; SA5. The District Court stated that the trial in the Antiguan Proceedings has concluded

---

[4] They include Alkiviades David, Fancy Bridge Limited, 15500 Pines Boulevard LLC, SwissX Redd UK LTD, SwissX UK LTD, Anakando SwissX AG, Global Bank of Commerce, and Eastern Caribbean Amalgamated Bank.

and there was no "objective basis" to conclude that the judgement would be unfavorable to Appellant prompting her to appeal. JA563; SA5.

With respect to the Contemplated Emirati Proceedings, the District Court concluded that such proceedings were not sufficiently "within reasonable contemplation." JA565; SA7. The District Court held that a contemplated proceeding is "merely speculative" if requested discovery must first be used to persuade a third party to initiate the formal proceeding. JA565–66; SA7–8. The District Court then concluded that the initiation of a formal criminal proceeding against Browne and his possible co-conspirators requires a "lengthy chain of contingencies" and that the most Appellant can do is give the evidence to the prosecution. JA565–66; SA7–8. Based on these conclusions, the District Court found that the Contemplated Emirati Proceedings were too speculative to satisfy the "for use" requirement. JA565–67; SA7–9.

## STANDARD OF REVIEW

This Court reviews *de novo* a District Court's determination whether an application meets the statutory requirements of 28 U.S.C. § 1782. *Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*, 27 F.4th 136, 147 (2d Cir. 2022); *see also Kiobel by Samkalden v. Cravath, Swaine &*

*Moore LLP*, 895 F.3d 238, 243 (2d Cir. 2018); *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015); *Certain Funds, Accts. &/or Inv. Vehicles v. KPMG, LLP*, 798 F.3d 113, 117 (2d Cir. 2015); *In re Bourlakova*, No. 24-3187-CV, 2025 WL 1733495, at \*1 (2d Cir. June 23, 2025).

The existence of standing is another question of law that this Court reviews *de novo. Doe v. Hochul*, 139 F.4th 165, 176 (2d Cir. 2025) (quoting *Shain v. Ellison*, 356 F.3d 211, 214 (2d Cir. 2004)).

## SUMMARY OF THE ARGUMENT

This Court should reverse the District Court's ruling for three independent reasons: (1) Appellees lacked standing to challenge the Subpoenas to the extent they targeted third parties who chose not to intervene in this case; (2) Appellant made a sufficient showing that the Requested Discovery is "for use" in the Antiguan Proceedings; and (3) Appellant made a sufficient showing that the Requested Discovery is "for use" in the Contemplated Emirati Proceedings and that those proceedings are "within reasonable contemplation" under this Court's controlling precedents.

*First*, the District Court erred in quashing the Subpoenas in their entirety. Appellees represent only sixty percent of all persons and entities

targeted by the Subpoenas, and the remaining forty percent of the targets chose not to challenge the Subpoenas. Appellees did not dispute that they lacked standing to challenge the Subpoenas on behalf of non-appearing targets and did not make any arguments in support of quashing the Subpoenas *en toto*. Yet the District Court quashed the Subpoenas in their entirety *sua sponte* without citing any applicable law. At minimum, the District Court should have conducted a target-by-target determination of whether Appellant's Application met the statutory requirements with regard to each target.

*Second*, Appellant identified the exact mechanism she will use to "inject" the Requested Discovery at the appellate stage of the Antiguan Proceedings. The District Court did not find this uncontroversial mechanism insufficient. Instead, the District Court implicitly ruled that such an appeal would be a new proceeding, separate from the underlying trial, even within the same judicial system. Thus, while the trial court's judgment is pending, the appeal could only be "contemplated." But a trial and an appeal are stages of a single judicial proceeding, at least in the systems where parties can file appeals as a matter of right. Were it otherwise, district courts would need to conduct a complicated and

22

unreliable analysis of foreign law to determine how a foreign tribunal would rule on the merits of a dispute and whether the verdict will likely be "unfavorable" enough to prompt an appeal. Nor is it practical to have an applicant bring a successive Section 1782 application once an appeal commences, which would be fundamentally inconsistent with that statute's aim of providing *efficient* means of assistance to participants in international litigation in federal courts.

Even if a foreign appeal of right were somehow a separate proceeding, the District Court nevertheless erred in holding that Appellant needed to show that the Antiguan Trial Court's judgment will be "unfavorable" to prove that the appeal is "within reasonable contemplation." That self-defeating burden compels an applicant to concede the very claim they seek to vindicate and is unnecessary under this Court's precedents. This Court does not require an applicant to show that contemplated proceedings are certain or imminent, but only that they are not speculative. Appellant showed that she may file an appeal if she finds the Antiguan Trial Court's decision "unfavorable." In fact, the case had already been appealed to the Antiguan Appellate Court on one issue and returned for trial on the merits, underscoring Appellant's

23

commitment to pursuing all legal relief available. The District Court also erred in treating the "unfavorable" test as an objective rather than subjective inquiry into Appellant's satisfaction with the result. And even if Appellant received an objectively favorable ruling, it is "within reasonable contemplation" that the Antiguan government will appeal a one-hundred-million-dollar judgment against itself. The discovery would be just as useful in that appeal as well.

*Finally*, Appellant demonstrated a practical ability to use the Requested Discovery in the Contemplated Emirati Proceedings by identifying the mechanism she intended to use to present evidence to the UAE Federal Public Prosecution. In finding otherwise, the District Court erroneously relied on another district court decision which misapplied this Court's precedents about civil litigation where an applicant sought persuade a third party to initiate proceedings. But unlike civil cases, criminal proceedings are triggered once a prosecutorial authority receives a complaint—regardless of whether charges are ultimately brought against the accused—because Section 1782 expressly defines foreign "proceeding[s]" to include "criminal investigations conducted before formal accusation." Failing to acknowledge this statutory

24

language, the District Court focused on the hurdles that Appellant would need to overcome to convince the UAE Federal Public Prosecution to bring formal charges; but failed to consider the facts demonstrating an "objective basis" that Appellant would be able to overcome those hurdles and trigger a criminal investigation, which is the correct standard, and falls squarely within Section 1782's terms.

## ARGUMENT

### I. The District Court Erred In Quashing The Subpoenas In Their Entirety Because Appellees Had No Standing To Seek Relief For Non-Appearing Targets Of The Subpoenas

It is well-settled that the "ultimate targets" of a Section 1782 subpoena issued to a third party "have standing to challenge the district court's power to issue a subpoena under the terms of an authorizing statute." *In re Request of Susan Devine for Jud. Assistance pursuant to 28 U.S.C. § 1782 for the Liechtenstein Princely Ct.*, No. 22-MC-133 (VSB), 2022 WL 1658586, at \*3 (S.D.N.Y. May 25, 2022) (quoting *In re Application of Sarrio, S.A.*, 119 F.3d 143, 148 (2d Cir. 1997)). The District Court, however, granted relief far beyond this principle.

Appellees collectively brought two Motions to Quash the Subpoenas that sought their financial information. Appellees did not assert any rights on behalf of non-appearing Subpoena targets. Appellee WIOC went even further, expressly stating that its Motion "only seeks to quash the Subpoenas as pertain to WIOC-related records."[5] JA512. Still, the

---

[5] Appellees accordingly have waived any argument on appeal that the District Court properly quashed the subpoenas in their entirety. *Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 367 (2d Cir. 2021) ("The law in this Circuit is clear that where a party . . . advances arguments available but not pressed below, waiver will bar raising the issue on appeal.").

District Court *sua sponte* quashed the Subpoenas even to the extent they sought records of non-appearing targets. JA567; SA9. This was error, and this Court should, at minimum, reverse the District Court's order to the extent it granted relief to non-intervening third parties.

## A. Appellees Lack Standing To Challenge The Subpoenas On Behalf Of Other Subpoena Targets

Though no court to date appears to have examined whether intervenors may challenge Section 1782 subpoenas to the extent the subpoenas seek records of other parties who have chosen to not intervene, ordinary standing principles make clear that they may not.

Article III standing "is not to be placed in the hands of 'concerned bystanders.'" *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013) (quoting *Diamond v. Charles*, 476 U.S. 54, 62 (1986)). "In the absence of a claim of privilege a party usually does not have standing to object to a subpoena directed to a non-party witness." *See Langford v. Chrysler Motors Corp.*, 513 F.2d 1121, 1126 (2d Cir. 1975). This is why courts generally do not permit a subpoenaed party to quash subpoenas directed at someone else. *See, e.g.*, *In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517, 520 (S.D.N.Y. 2016) ("While neither party disputes that Vale has

27

standing to move to quash the subpoena directed at it, Vale does not have standing to challenge discovery directed at other third parties."); *Estate of Ungar v. Palestinian Auth.*, 400 F. Supp. 2d 541, 554 (S.D.N.Y. 2005) (granting a third party's motion to quash regarding the subpoena directed at it, but denying its motion to quash "all other third-party subpoenas" for "lack of standing"); *In re Kleimar N.V v. Benxi Iron & Steel Am., Ltd.*, No. 17-CV-01287, 2017 WL 3386115, at *4 (N.D. Ill. Aug. 7, 2017) ("Though Benxi clearly has standing to seek to vacate the subpoena served on it, Benxi does not have standing to challenge the subpoena served on Mega.").

That also makes sense from first principles. "For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor." *Town of Chester, v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). An intervenor no doubt has standing to seek the relief of quashing a subpoena for its own records, as disclosure would cause injury that the court's order would redress. But a subpoena aimed at another party's records generally causes the intervenor no harm at all, so the intervenor lacks standing to "seek[]" the "relief" of quashing a subpoena for third-party records. *Id.* at 439–40.

28

In fact, had Appellant submitted a separate subpoena for each target whose records she sought, the District Court's decision to quash all Subpoenas on Appellees' Motions would contradict *Langford*, because it would allow Appellees to challenge subpoenas directed at third parties and seeking solely information belonging to other third parties. The fact that Appellant combined her Requested Discovery into two Subpoenas should not alter this outcome.

Further, to successfully intervene, a movant must "(1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *United States v. City of New York*, 198 F.3d 360, 364 (2d Cir. 1999). Thus, a party who otherwise may have standing to challenge a subpoena cannot seek an advantage if the party fails to timely intervene and make the appropriate showings. Here, the non-appearing targets did not timely intervene, and Appellees, even if they could seek relief on behalf of non-appearing targets, did not make the requisite showing on behalf of such non-appearing targets. In fact, Appellee WIOC explicitly denied that it was even attempting to make such a showing.

29

**B. Even If The District Court Could Quash The Subpoenas In Their Entirety, It Should Have Conducted A Target-By-Target Inquiry**

Even if just one of the targets could challenge the Section 1782 Subpoenas *en toto*, the District Court erred in granting such relief without examining each of the targets separately.

Not all Section 1782 subpoena targets are similarly situated in relation to a foreign proceeding. While an applicant may not meet the burden of proof as to one target, the applicant may be able to clear this hurdle with respect to the remaining targets. For instance, when an applicant files an application under Section 1782, he or she may have scant evidence linking one of the targets to the underlying foreign proceedings, while having robust evidence of other targets' involvement. Similarly, in applications where multiple proceedings serve as a basis for discovery, the declarations of some experts may be less clear or credible than declarations of the other experts. In such cases, a district court may find certain proceedings unqualified under the statute but not all the proceedings. In these examples, the subpoena targets are situated differently, and the statutory requirements of Section 1782 may be satisfied for some but not all.

Allowing one subpoena target to quash an entire subpoena without further inquiry into non-appearing targets would create a perverse incentive for a target of lesser (or harder to prove) relevance to appear and challenge the subpoena, which may stand if challenged by other targets with a more obvious relevance, such as a party to a foreign proceeding. Similarly, if targets are relevant to different proceedings, they might determine that certain expert declarations are easier to attack than others and choose the challenging targets accordingly. This Court should not encourage such gamesmanship.

Further, such a loophole would force applicants to bring separate applications for each target to avoid an outcome where one target can quash the entire subpoena. This would increase the burden on the courts, which may have to review and consider more applications, even when the applications could have been combined into a single application for convenience and expediency. Similarly, this would increase the burden on the subpoenaed parties, who would have to process multiple separate subpoenas instead of one and challenge such subpoenas individually if they have any objections to the compliance.

This is not to say that a Section 1782 subpoena could never be invalid in its entirety. For instance, if a trial court finds that no foreign proceedings exist or that the applicant is not an interested party in relation to any proceeding, the court could conclude that the applicant has not met the statutory requirements to bring the application, regardless of the targets of the requested discovery. But in cases like this, where the District Court made a preliminary finding that the statutory requirements were met, and where no one disputes that the foreign proceedings exist and that Appellant is a party to each of them, and where none of the Appellees argued that the court should or even could quash the entire Subpoenas, a court should avoid quashing subpoenas in their entirety, or, at a very minimum, analyze whether the statutory requirements are not satisfied as to each subpoena target. The District Court has not done so.

## II. The District Court Erred In Finding That The Antiguan Proceedings Did Not Satisfy The Statutory "For Use" Requirement

To obtain discovery under Section 1782, an applicant must satisfy three statutory requirements: "(1) the person or entity from whom discovery is sought 'resides' or is 'found' in the district where the

32

application is made; (2) the requested material is 'for use' in a foreign proceeding; and (3) 'the application is made by a foreign or international tribunal or any interested person.'" *In re BonSens.org*, 95 F.4th 75, 79 (2d Cir. 2024). If the district court determines that the statutory requirements are satisfied, it has discretion to grant the application. *Id.* The district court's discretion is then guided by the policy underlying the statute[6] and four factors the Supreme Court identified in *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241 (2004). *See BonSens.org*, 95 F.4th at 80–81. Only the second statutory requirement—that the discovery is "for use" in a foreign proceeding—is at issue on this appeal. JA562; SA4.

The "for use" statutory requirement assesses "the *practical ability* of an applicant to place a beneficial document—or the information it contains—before a foreign tribunal." *Id.* at 80 (quoting *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017)) (emphasis in original).

---

[6] The so-called "twin aims of the statute," which are "providing efficient means of assistance to participants in international litigation in our federal courts" and "encouraging foreign countries by example to provide similar means of assistance to our courts." *BonSens.org*, 95 F.4th at 79–80 (quoting *In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997)).

33

Put another way, "the requested discovery must 'be employed with some advantage or serve some use in the proceeding.'" *Id.*; *see also Mees v. Buiter*, 793 F.3d 291, 295 (2d Cir. 2015) ("A § 1782 applicant satisfies the statute's 'for use' requirement by showing that the materials she seeks are to be used at some stage of a foreign proceeding."). An applicant may satisfy the "for use" requirement by showing circumstances under which the foreign tribunal "could hear new evidence—regardless of how narrow those circumstances might be." *BonSens.org*, 95 F.4th at 80 (citing *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 83 (2d Cir. 2012)).

Even so, an applicant must identify some "procedural mechanism" by which he or she can inject the discovery into the foreign proceeding. *BonSens.org*, 95 F.4th at 80 (quoting *IJK Palm LLC v. Anholt Servs. USA, Inc.*, 33 F.4th 669, 680 (2d Cir. 2022)). For instance, if an appellate court "does not take and hear new evidence," the discovery cannot be used in such appeal, and the requirement may not be satisfied. *See Euromepa, S.A. v. R. Esmerian, Inc.,* 154 F.3d 24, 29 (2d Cir. 1998) ("[T]he discovery certainly could not be 'for use in' the French Supreme Court appeal if that court does not take and hear new evidence."). On the other hand, if an

appellate court may hear new evidence, even if only under a narrow exception, the requirement is met. *See Brandi-Dohrn*, 673 F.3d at 83 (the "for use" requirement is satisfied because "there are circumstances under which [German appellate court] could hear new evidence—regardless of how narrow those circumstances might be.").

A foreign proceeding where the discovery could be used "need not be 'pending,' or 'imminent,' but must still be 'within reasonable contemplation.'" *BonSens.org*, 95 F.4th at 80 (citing *Mangouras v. Squire Patton Boggs,* 980 F.3d 88, 100 (2d Cir. 2020) (quoting *Intel*, 542 U.S. at 259)). To show that a proceeding is "within reasonable contemplation," an applicant "must have more than a subjective intent to undertake some legal action, and instead must provide some objective indicium that the action is being contemplated." *Certain Funds,* 798 F.3d at 123. Although there is no hard-and-fast rule regarding the necessary showing, "[a]t a minimum," an applicant must present "some concrete basis from which [the district court] can determine that the contemplated proceeding is more than just a twinkle in counsel's eye." *Id.* 124.

Further, if "an applicant's ability to initiate a proceeding in which the requested discovery may be used 'depends on some intervening event

35

or decision,' the applicant must 'provide an objective basis on which to conclude that the event will occur or the requisite decision will be favorable.'" *BonSens.org*, 95 F.4th at 80–81 (citing *IJK Palm*, 33 F.4th at 680).

Here, Appellant intends to use the Requested Discovery in the pending Antiguan Proceedings. As with many cases, the Antiguan Proceedings have multiple stages: (1) a trial-level preliminary injunction stage that concluded in June 2023; (2) an appellate-level preliminary injunction stage that concluded soon after; (3) a merits trial stage that is still ongoing, although the parties expect it to conclude imminently; (3) the appellate stage that follows the conclusion of the trial stage; and (4) post-appellate stages, such as a new trial or a higher level of appellate review in the Judicial Committee of the Privy Council in London. *See* JA324–25 ¶¶ 5–10; *see also generally* JA77–98, 100–42. Appellant has already demonstrated the exact mechanism she can and intends to use to place the Requested Discovery in front of the Antiguan Appellate Court to adduce newly discovered evidence on appeal.[7] JA325–27 ¶¶ 11–17.

---

[7] This exact mechanism was found to satisfy the "for use" requirements in other cases where a Section 1782 applicant sought discovery to adduce to an appeal in Antigua and Barbuda. *See, e.g.*,

Appellees argued that the appeal is a separate, contemplated proceeding and that Appellant must prove that the trial court's judgment will be unfavorable to her. JA368–70, 414–15. The District Court, in turn, applied the contemplated proceeding standard and concluded that the appeal did not satisfy the "for use" requirement because it was premised on an "unfavorable" judgment against Appellant and there was "no objective basis" for the District Court to conclude that the judgment would, in fact, be "unfavorable." JA563; SA5. This determination was erroneous. But even if an appeal in the Antiguan Proceedings were indeed only a contemplated proceeding, the District Court still misinterpreted the burden Appellant was required to meet.

### A. The Appellate Stage Of Already-Pending Proceedings In Antigua Is Not A Separate, Contemplated Proceeding

Neither this Court nor another circuit court appears to have expressly considered whether the trial and appellate stages of the same case in the same foreign judicial system constitute the same or separate

---

*Mussington v. Deborah Brosnan & Assocs., LLC*, 708 F. Supp. 3d 1, 14–15 (D.D.C. 2023); *In re Byrne*, 2023 WL 3203811 (S.D.N.Y., 2023); *Dannacher v. Cloudflare*, Inc., 2024 WL 2875097 (N.D.Cal., 2024).

37

foreign proceedings for the purposes of the statutory "for use" requirement. But they indeed constitute the same proceeding.

The threshold difference between the use of discovery in pending proceedings and in contemplated ones is a necessity to first show that a contemplated proceeding is "within reasonable contemplation." *See BonSens.org*, 95 F.4th at 80–81. Applying this principle to stages of litigation in the same action, however, would require an applicant to submit evidence establishing that a foreign court's decision at every given stage would be favorable or unfavorable—a showing that is hardly possible even within our domestic court system, let alone a foreign one.

Although this Court has never resolved this exact question, it considered a substantially similar situation in *Mees v. Buiter*, 793 F.3d 291 (2d Cir. 2015), concluding that "a painstaking analysis" of "the amount of evidence required to prevail in the foreign proceeding" and of foreign law in general should not be required to satisfy the Section 1782 "for use" requirement. *Id*. at 298. The Court held that "requiring an applicant to wait until the stage in the foreign proceeding at which the materials are to be used before applying for discovery under [Section] 1782—which might entail multiple, separate applications—would be

38

contrary to the statute's aim of 'providing efficient means of assistance to participants in international litigation.'" *Id*. at 300 (quoting *Brandi-Dohrn*, 673 F.3d at 81).

In *Mees*, the district court denied a Section 1782 application, finding that the "for use" requirement was not satisfied because the materials sought were not necessary to draft an adequate complaint. 793 F.3d at 296–97. This Court reversed for two reasons. As relevant here, the Court held that a necessity requirement would be "unwise" and "in tension with the aims of section 1782." *Id*. at 298. This is because such a requirement "would entail a painstaking analysis not only of the evidence already available to the applicant, but also of the amount of evidence required to prevail in the foreign proceeding" and thus would "require interpretation and analysis of foreign law." *Id*. Citing its decision in *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095 (2d Cir. 1995), this Court reaffirmed its rejection of "speculative forays into legal territories unfamiliar to federal judges," which are "a costly, time-consuming, and inherently unreliable method of deciding section 1782 requests" and "cannot possibly promote the 'twin aims' of the statute." *Mees,* 793 F.3d at 298–99. The Court added that "even in the context of our own laws, the question of who will

39

ultimately prevail on what evidence can usually only be a subject of speculation at the pleading stage." *Id*. at 299.

Here, requiring Appellant to *prove* that the Antiguan Trial Court's judgment will be "unfavorable" to her (and thus triggering an appeal) raises the same concerns. As in *Mees*, the District Court would have to conduct "a costly, time-consuming, and inherently unreliable" analysis of foreign law to determine the likelihood of an unfavorable judgment—an exercise likely futile, even in our own legal system. It is also unclear how certain the District Court would need to be that the judgment will be unfavorable: must the likelihood be only more than zero? Should it be at least fifty-one percent? Or is anything short of one hundred percent insufficient? Section 1782 provides no basis to choose one standard over another.

Unlike *Mees*, where the foreign-law question was whether the applicant *can prevail*, the District Court here effectively required Appellant to show that she *cannot prevail or is unlikely to prevail*. This is an insurmountable burden for any applicant, which would require her to prejudice herself in the underlying foreign proceedings by putting forward evidence and argument that she would certainly (or even just

40

likely) lose her case. Such a burden amounts to an extra-statutory barrier to obtaining discovery under Section 1782, which this Court does not allow. *See In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992) ("[D]istrict courts issuing discovery orders pursuant to 28 U.S.C. § 1782 may impose conditions to minimize the compliance burdens, so long as those conditions do not impose extra-statutory barriers to obtaining discovery such as an exhaustion requirement.").

But this fictitious barrier is easily eliminated when an appeal is considered another stage of the overall proceedings, at least in the systems where the first level of appellate review can be initiated as a matter of right. Indeed, this case illustrates how fluidly a case can move between a trial and an appellate court in Antigua and Barbuda. After the Antiguan Trial Court denied Appellant a preliminary injunction, but allowed her case to proceed on the merits, both she and the Antiguan government appealed. Only after the Antiguan Appellate Court affirmed the Trial Court's decision did the case proceed on the merits. Following the District Court's logic, Appellant may have had to file different Section 1782 applications at each stage of this fluid litigation as it moved between Antiguan courts. This outcome "would be contrary to the statute's aim of

41

'providing efficient means of assistance to participants in international litigation.'" *See Mees*, 793 F.3d at 300 (quoting *Brandi-Dohrn*, 673 F.3d at 81).

Had the District Court applied the correct framework, it would not have needed to determine the likelihood of success on appeal, just as it would not need to determine a party's likelihood of success at the pleading stage or on summary judgment. Instead, the District Court's analysis should have focused on the relevant inquiry—whether Appellant has a *practical* ability and a procedural right to inject requested discovery at the relevant stage of proceedings. It is undisputed that Appellant has a procedural right to appeal, and she submitted unrebutted evidence that she can adduce new evidence on appeal. This is where the District Court's analysis should have ended. It is irrelevant that Appellant might not succeed in exercising her rights or might decide not to do so, as long as a mechanism permits the use of the Requested Discovery. *See, e.g.*, *Mussington v. Deborah Brosnan & Assocs., LLC*, 708 F. Supp. 3d 1, 14 (D.D.C. 2023) ("Because the Court's proper inquiry at this stage is limited to identifying whether there is some path by which Applicants can inject the documents they seek here into the proceedings in Antigua and

42

Barbuda, the Court will refrain from engaging in an analysis of the precedent and rules of the Judicial Committee to determine whether it is *likely* to accept that material." (emphasis in original)).

**B. Even If The Appellate Stage Of The Antiguan Proceedings Is A Separate, Contemplated Proceeding, The District Court Applied The Standard Incorrectly**

Even if the appeal from the Antiguan Trial Court's verdict is a separate proceeding and is only contemplated at this stage, the District Court nevertheless held Appellant to a higher standard than required under this Court's precedents.

The District Court ruled that the appeal was too speculative because it was premised on an "unfavorable" verdict at the trial stage, and that Appellant did not offer any proof that the verdict would be "unfavorable."[8] But Appellant was not required to make such a showing. Instead, Appellant need only show that an appeal is within "reasonable contemplation." *See BonSens.org*, 95 F.4th at 80; *see, e.g.*, *In re Bouka*, 654 F. Supp. 3d 283, 289 (S.D.N.Y. 2023) (quoting *Intel*, 542 U.S. at 259)

---

[8] As discussed above, putting forward such arguments and evidence (if they existed) would be prejudicial to Appellant's position in the Antiguan Proceedings and may enable the Antiguan government to use them against her.

43

(finding "of no moment that the proceeding could theoretically be terminated if the appeal were successful" and holding that "[t]he fact is that the criminal proceeding exists now, and that is enough for us to find . . . that the proceeding's future vitality — and thus future amenability to receiving evidence — is 'within reasonable contemplation.'"). Appellant offered more than sufficient evidence to make that showing. *First*, she submitted an unrebutted expert declaration establishing that an appeal is the next stage after the Antiguan Trial Court's verdict. JA325 ¶ 10. As such, she need not convince any third party to initiate an appeal—this decision is in her own hands. *Cf. IJK Palm LLC*, 33 F.4th at 677–78 ("[D]iscovery material is not 'for use' in a foreign proceeding if it must first be used to persuade a third party to initiate that proceeding."). *Second*, Appellant submitted evidence of her ability to appeal and the Antiguan government's ability to cross-appeal by showing that the parties did exactly this during the preliminary injunction stage of the Antiguan Proceedings. *See generally* JA100–42. *Third*, she submitted her counsel's sworn declaration that she in fact intends to initiate any such appeal. JA325 ¶10; *see In re Application of Shervin Pishevar for an Ord. to take Discovery for use in Foreign Proc. Pursuant to 28 U.S.C. § 1782*,

44

439 F. Supp. 3d 290, 302–03 (S.D.N.Y. 2020) (quoting *In re Furstenberg Fin. SAS*, 2018 WL 3392882, at *4 (S.D.N.Y. July 12, 2018)) ("Petitioner's counsel has 'sworn that [Petitioner] intend[s] to file a criminal complaint against [the Confidential Source] in the [United Kingdom] and [has] articulated . . . specific legal theor[ies] on which [he] intends to rely.' As in Furstenberg, the sworn declaration of counsel is a 'sufficient' indicium that 'the [criminal] action is within reasonable contemplation.'" (internal citations omitted)).

*Finally*, contrary to the District Court's ruling, whether a trial court's judgment is "unfavorable" is largely a subjective determination of Appellant. Even if Appellant wins on the merits—proving that *both* the seizure and the sale were unconstitutional—Appellant may be dissatisfied with the amount of the damages award.[9] Given that Appellant need not persuade any party to initiate the appeal, her right

---

[9] The District Court stated in passing that it was not convinced that the records sought would be relevant to the issues raised on appeal. But as long as the records are relevant to the issues considered on the merits—whether the seizure and sale were constitutional and the size of damages if it was not (*see generally* JA77–98, 100–42)—it is not mere speculation that evidence tending to show that Browne used his position to misappropriate the *Alfa Nero* to enrich himself would be relevant to the issue of the constitutionality of the taking and Appellant's damages. *See* 4-2 at ¶¶ 29–31, 111–12.

and willingness to do so demonstrate that the appeal is more than merely speculative.

Under the correct standard, Appellant need not show that any appeal is certain or imminent. She need only show that it is "within reasonable contemplation." It is undisputed that if Appellant is dissatisfied with the Antiguan Trial Court's verdict, she has a practical ability and a procedural right to appeal. She also submitted unrebutted evidence that she has the right and ability to adduce new evidence for the Antiguan Appellate Court's consideration. It is within reasonable contemplation that she would do so, even if the verdict is favorable on merits but Appellant is dissatisfied with the damages awarded. Absolute certainty is not required. *See, e.g.*, *In re Byrne*, 2023 WL 3203811, at *5 (S.D.N.Y. May 2, 2023) (citing *Euromepa S.A.*, 51 F.3d at 1099; *Intel,* 542 U.S. at 256-57) ("Petitioner need not demonstrate that he holds a winning claim; it is enough that he has demonstrated an interest in obtaining discovery in the United States because of his participation in foreign proceedings."); *In re Pishevar*, 2020 WL 1862586 (S.D.N.Y. Apr. 14, 2020) (citing *Mees*, 793 F.3d at 298–99; *Euromepa S.A.*, 51 F.3d at 1099-1100)

46

("[I]t is not incumbent on this Court to determine" whether claims are timely or viable).

But even if Appellant needed to show that the appeal remains "within reasonable contemplation" even if she obtains a complete, unqualified win, it surely does: the Antiguan government will certainly appeal a one-hundred-million-dollar judgment against itself.

## III. The District Court Applied An Erroneous Standard In Determining Whether The Contemplated Emirati Proceedings Were "Within Reasonable Contemplation"

As detailed above, under this Court's precedents, when evaluating a Section 1782 application that relies on a contemplated foreign proceeding, the district court must assess "if a movant's ability to initiate a proceeding depends on some intervening event or decision," and if so, whether the applicant has "provide[d] an objective basis on which to conclude that the event will occur." *IJK Palm,* 33 F.4th at 680. The District Court erred here by failing to properly apply this rule, instead largely relying on a separate district court decision which itself misapplied the relevant standard. In doing so, the District Court erroneously failed to complete the inquiry required by *Intel* and *IJK Palm*. Put another way, while the District Court looked for the

47

"procedural hurdles" considered in *IJK Palm*, the District Court failed to consider whether Appellant had provided an "objective basis" to believe these hurdles would be overcome.

At the outset, Appellant notes that the District Court did not appear to question whether Appellant had "'the practical ability to inject the requested information into [the] foreign proceeding' that it contemplates." *Id.* at 677 (quoting *Accent Delight*, 869 F.3d at 132). And Appellant's foreign law declaration detailed exactly how the Requested Discovery could and would be used to lodge a criminal petition in the UAE and thus trigger an investigation. JA337–38 ¶ 8. Rather, the District Court's basis for finding that the Requested Discovery was not "for use" in the Contemplated Emirati Proceedings was that "the potential proceedings in the UAE are far too speculative to support Appellant's request." JA565; SA7. The District Court then cited to Appellant's foreign law expert and concluded that a number of procedural hurdles rendered the application too speculative:

> [Appellant's] own foreign law expert concedes that the discovery "will allow [Appellant] to determine *whether and how* Browne, *possibly* with the assistance of others, executed a self-interested seizure and sale of the vessel." ECF No. 8 ("Gunson Decl."), ¶ 12 (emphases added). Moreover, even if she finds evidence to support her suspicions, she could not

48

submit it to a court. Instead, she would "file[] [it] with the UAE Federal Public Prosecution," which, in turn, would investigate only "[*i*]*f* the petition is deemed admissible." *Id.* ¶ 8 (emphasis added). "*If* sufficient evidence is found," [Appellant's] foreign law expert continues, "the UAE Federal Public Prosecution *may* proceed with formal charges." *Id.* (emphasis added). This lengthy chain of contingencies makes plain that there is no "concrete basis from which [the Court] can determine" that a proceeding in the UAE in which [Appellant] could make use of the requested discovery "is more than just a twinkle in counsel's eye." *Certain Funds*, 798 F.3d at 124. As in *In re Klein*, No. 23-MC-211 (PAE), 2023 WL 8827847 (S.D.N.Y. Dec. 21, 2023), the most it appears she could do is "forward the evidence" to the prosecution, "which, exercising its discretion, will decide whether to initiate a formal criminal proceeding." *Id.* at *9. That does not suffice.

JA565–66; SA7–8.

In reaching this holding, the District Court relied at multiple points on another district court opinion, *In re Saul Klein*, and specifically, that case's holding that Section 1782's "for use" requirement was not met where an applicant could at most "forward the evidence he obtains to the Criminal Authority, which, exercising its discretion, will decide whether to initiate a formal criminal prosecution." *In re Saul Klein,* No. 23 MISC. 211 (PAE), 2023 WL 8827847, at *9 (S.D.N.Y. Dec. 21, 2023) ("*Klein* I").

The District Court noted that *Klein* had been affirmed on appeal (JA565; SA7), but critically, failed to recognize that *Klein* had only been affirmed on other grounds—specifically, the discretionary *Intel* factors,

49

but not the statutory Section 1782 elements. *See Klein v. Altara RK Invs. Ltd.,* No. 24-228-CV, 2025 WL 560105, at *1 (2d Cir. Feb. 20, 2025) ("*Klein* II") (noting that "the district court denied [Klein]'s application on the ground that he failed to demonstrate that he was entitled to the foreign discovery he sought under factors set forth in *Intel,*" and analyzing the lower court's application of the *Intel* factors). The District Court nonetheless applied *Klein I's* analysis of the statutory "for use" requirement—which was not addressed or affirmed on appeal—to reach its holding here. Because *Klein I* cannot be squared with this Court's precedent and the text of Section 1782, the District Court's adherence to it was error.

While *Klein I* is not under review here, because the District Court relied heavily on *Klein I's* application of the statutory Section 1782 factors, the problems with that decision were imported here, and thus help explain how the District Court erred. *Klein I*—and by extension, the District Court here—misapplied *IJK Palm* and *Certain Funds* by failing to recognize that these precedents concerned contemplated civil—not criminal—proceedings. In doing so, *Klein I* failed to address the plain text of the Section 1782, which expressly permits discovery "for use in a

50

proceeding in a foreign or international tribunal, *including criminal investigations conducted before formal accusation.*" 28 U.S.C. § 1782(a) (emphasis added). This distinction between criminal and civil is not relevant to all of Section 1782's statutory and discretionary factors, but it is critical to harmonizing the Second Circuit's caselaw construing the "for use" requirement, because criminal *investigations* are almost always conducted in whole or part by a third-party (*i.e.*, a magistrate, investigator, prosecutor, etc.) before there is any decision on whether to bring formal charges. As such, when *Klein I* applied *Certain Funds* and *IJK Palm* to foreclose discovery in a contemplated criminal proceeding because a third party would ultimately "decide whether to initiate a *formal criminal prosecution*" (*Klein I*, 2023 WL 8827847, at *9) (emphasis added), it ignored Congress's express command to permit discovery under Section 1782 for use in "criminal investigations conducted *before formal accusation.*" *See In re Application for an Ord. Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proc. ("Berlamont")*, 773 F.3d 456, 461 (2d Cir. 2014) (recognizing that Congress "cemented the statute's applicability to foreign criminal investigations" when it amended its language to expressly permit discovery "for use in a

51

proceeding in a foreign or international tribunal, *including criminal investigations conducted before formal accusation.*") (emphasis original). And unlike *IJK Palm* and *Certain Funds*, this Court's decisions in *Accent Delight* and *Berlamont* concerned contemplated *criminal* proceedings and investigations, not civil ones, and in both cases this Court permitted discovery even though the petitioner "was not a party to the foreign proceeding" and was "press[ing] no claim for relief on its own behalf." *Accent Delight*, 869 F.3d at 129.[10]

*Klein I* cannot fairly be reconciled with the plain text of Section 1782, and the District Court carried over this error from *Klein I*, finding that the Contemplated Emirati Proceedings were too speculative because, *inter alia*, it was uncertain whether UAE prosecutors would ultimately bring formal charges. *See* JA565; SA7 ("*If* sufficient evidence is found…the UAE Federal Public Prosecution *may* proceed with formal charges.…As in [*Klein I*] the most it appears [Appellant] could do is 'forward the evidence' to the prosecution, 'which, exercising its discretion,

_____

[10] *Klein I* is therefore also inconsistent with the Second Circuit's holdings "reject[ing]…as contrary to the text of the statute" the argument that "crime victims" are "unable to satisfy [1782's] 'for use' requirement." *Accent Delight*, 869 F.3d at 129 (citing *Berlamont*, 773 F.3d 456, 461 (2d Cir. 2014)).

will decide whether to initiate a formal criminal proceeding.' That does not suffice.") (emphasis in original, internal citation omitted). Just as in *Klein I*, the District Court's focus on whether formal charges might ultimately be brought fails to acknowledge the plain language of Section 1782(a) that "includ[es] criminal investigations conducted before formal accusation" as foreign proceedings under the statute.

Once the erroneous holding of *Klein I* is disregarded, a straightforward application of *IJK Palm* requires reversal here. In *IJK Palm*, this Court sought to harmonize prior circuit precedent in *Certain Funds*—which held the "for use" requirement was not met where an applicant could at most "furnish information *in the hope* that it might be used" (798 F.3d at 121) (emphasis original)—with the Supreme Court's decision in *Intel*—which explicitly approved of discovery under the Section 1782 for materials the applicant planned to present to the Directorate-General for Competition of the Commission of the European Communities in order to trigger a competition investigation. *See IJK Palm,* 33 F.4th at 678. This Court conducted a careful analysis of the procedural rights afforded to the applicant in *Intel*, compared them with the applicants in *IJK Palm*, who were seeking discovery to potentially

53

persuade liquidators to bring suit on the applicant's behalf, and ultimately found that "the liquidators in [*IJK Palm*] are far different from the DG-Competition in *Intel*." *Id*. This Court then identified a series of factors in *Intel* which distinguished the applicant there: namely, "[i]n *Intel*, the movant's complaint to the DG-Competition triggered an investigation and recommendation," and "[w]hen it receives a complaint, [the DG-Competition] is responsible for conducting a preliminary investigation and making a recommendation about whether to pursue the complaint further." *Id*. This Court contrasted the DG-Competition process with the one in *IJK*, finding that simply presenting materials to liquidators would not trigger any specific inquiry, and the "mere opportunity to present material to a party to a potential future lawsuit does not satisfy the requirement of the [Section] 1782 that the material be 'for use' in a foreign proceeding." *Id*. In sum, the decisive factor was whether the submission of the Section 1782 discovery would "trigger[] an investigation and recommendation." *Id*.

The District Court here did not conduct any such analysis—indeed, it did not mention *Intel* at all in evaluating this statutory factor. Instead, the District Court briefly cited *IJK Palm* (JA565; SA7), but relied on

54

*Klein I's* erroneous interpretation of this precedent, failing to recognize that *Klein I* had elided over this analysis of *Intel* in *IJK Palm*. And because the District Court based its decision on *Klein I*, it fell into the same error.

*IJK Palm*'s careful attempt to align Second Circuit precedent with the Supreme Court's decision in *Intel* demonstrates exactly why the District Court here erred: Appellant's contemplated criminal proceedings are far more analogous to the procedure approved of in *Intel* than the civil liquidation procedure addressed in *IJK Palm*. For example, as Appellant's Emirati law expert testified:

> *first*, a petition is filed with the UAE Federal Public Prosecution in the Emirate of Abu Dhabi, which has jurisdiction over the prosecution of crimes committed abroad against claimants resident in the UAE .... If the petition is deemed admissible, the Federal Public Prosecution *will* initiate an investigation, gathering evidence *from the complainant* and other relevant sources, and *will* investigate whether or not the subject matter of the petition is a crime under the UAE Penal Code.

JA337–38 ¶ 8 (emphasis added).

Just as in *Intel*, Appellant's criminal petition triggers an investigation. And under the plain language of the Section 1782(a), a "proceeding in a foreign or international tribunal" specifically includes

55

"criminal investigations conducted before formal accusation." And this Circuit has squarely held that the ultimate decision of a foreign prosecutor is not relevant to the "for use" analysis, because the dispositive question remains the applicant's practical ability to present evidence, not the prosecutor's decision. *See In re B&C Kb Holding GmbH*, No. 23-1014, 2024 WL 3170983, at \*4 (2d Cir. June 26, 2024) ("[O]ur Court has never interpreted the 'for use' condition as requiring a letter of interest from a foreign official. Instead, the 'for use' condition is about an applicant's 'practical ability to inject the requested information into a foreign proceeding.'") (quoting *Accent Delight*, 869 F.3d at 132); *see also id.* at \*4, n.2 (quoting *Mees*, 793 F.3d at 304) ("[W]e have cautioned district courts not to 'condition discovery on an overt expression from the foreign [tribunal] that it wants or needs the information' sought by a Section 1782 application.").

Instead, the District Court focused on whether such a petition might be deemed admissible: "[Appellant] would file [the evidence] with the UAE Federal Public Prosecution, which, in turn, would investigate only *if* the petition is deemed admissible." JA566; SA8 (emphasis in

original).[11] But the District Court simply noted the possibility that the petition might be denied, and did not attempt to analyze the evidence Appellant had offered in support. Put another way, the District Court identified a "procedural hurdle," but critically, did not analyze whether Appellant had provided an "objective basis" on which to conclude that hurdle might be cleared. *IJK Palm*, 33 F.4th at 680.

This analysis was erroneous: the existence of intervening "hurdles" which may need to be overcome is not in itself a basis for denying a Section 1782 application. Under this Court's precedent, the District Court was obligated to not only consider whether intervening events would need to occur, but also whether Appellant had offered "an objective basis on which to conclude that the event will occur or the requisite decision will be favorable." *BonSens.org*, 95 F.4th at 81 (quoting *IJK Palm*, 33 F.4th at 680). Although the "objective basis" is a "fact-specific" inquiry, this Court has identified certain persuasive factors courts should

---

[11] The District Court's concerns with a "lengthy chain of contingencies" JA565–66; SA7–8, was similarly misplaced. Because Section 1782(a) expressly considers "criminal investigations conducted before formal accusation" to be foreign proceedings, the _only_ relevant contingency would be whether the initial petition was accepted and thus triggered a formal criminal investigation.

consider when determining whether a foreign proceeding is sufficiently contemplated under Section 1782: (1) whether the applicant "provide[d] the legal theory supporting such a proceeding," (2) whether they "clearly la[id] out either the content of [their] claims or even a sufficiently concrete basis for [their] belief" and (3) whether they "provide[d] sufficiently 'reliable indications of the likelihood that proceedings will be instituted within a reasonable time.'" *Mangouras*, 980 F.3d at 101–02 (citing *Certain Funds*, 798 F.3d at 123) (quoting *Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1270 (11th Cir. 2014)). The District Court did not engage in the second part of this analysis, simply noting that Appellant's petition might not be granted, but failing to address the substantial evidence Appellant had provided in support.

Had the District Court properly applied *Mangouras* and *IJK Palm* and considered the "objective basis on which to conclude that" the petition would be accepted, it would likely have reached a different conclusion. As detailed in the Application, each of the factors identified in *Mangouras* supported Appellant. The declaration of Appellant's Emirati counsel (who the District court recognized as a "foreign law expert" (JA566; SP8))

provided the specific legal theories and statutory citations concerning the criminal violations that Appellant is contemplating (JA337–38 ¶¶ 8, 11), set out the basis of these contemplated claims in detail (JA337–38 ¶¶ 6–10), and stated that such a complaint was expected to be lodged as soon as the requested discovery was produced and could be used. JA338 ¶ 10. Appellant also detailed how she had retained and deployed investigators who obtained and authenticated public and non-public records, (JA293 ¶¶ 1–2, JA295–96 ¶¶ 8, 10–12, A297 ¶¶21, 23, JA298 ¶¶ 24, 26–27, JA298 ¶¶ 29–29, JA300 ¶ 33, JA302–04 ¶¶ 39–42, JA305–06 ¶¶ 47–53, JA307–09 ¶¶56–58, 60, 62–64, JA310 ¶ 66, JA312–13 ¶¶ 72–74, 77, JA314 ¶¶ 78, 84, JA316 ¶¶ 89, 91–93, JA317–19 ¶¶ 94–104, JA320–21 ¶¶108–09, 111, JA321–22 ¶ 115), conducted dozens of interviews, including of former government officials (JA294 ¶ 5, JA296–97 ¶¶ 15–18, JA298 ¶ 25, JA299–301 ¶¶ 31–35, JA301–02 ¶¶ 37–39, JA304 ¶¶ 43–44, JA305–07 ¶¶ 51–52, 54–55, JA308 ¶ 59, JA308–09 ¶ 62, JA309 ¶ 64, JA310–11 ¶¶ 67–69, JA313 ¶¶ 75, 77, JA314 ¶¶ 79, 84, JA315–16 ¶¶ 86–87, JA318 ¶¶ 101–02, JA319–20 ¶¶ 106–07), traveled to Antigua and visited government offices in an attempt to obtain documents records (which had been removed) (JA300–01 ¶¶ 32–35), and took a range of

59

other investigative steps detailed in the extensive declaration from Appellant's lead investigator. *See generally* JA293–322. None of these facts were addressed by the District Court.

## CONCLUSION

For the above stated reasons, this Court should reverse the District Court's order quashing the Subpoenas and vacating its prior order granting the Application.

Dated: September 29, 2025

Respectfully Submitted,

/s/ *Martin De Luca*

Emiliano Martin De Luca
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
(212) 446-2300

Daria Pustilnik
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Street Suite 2800
Miami, FL 33131
305-539-8400

Dan Boyle
Tatiana Nikolaeva (*application for admission pending*)
BOIES SCHILLER FLEXNER LLP
2029 Century Park East, Ste. 1520
Los Angeles, CA 90067
(213) 995-5732

*Counsel for Claimant-Appellant*

60

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B), as modified by Local Rule 32.1(a)(4)(A), in accordance with Federal Rule of Appellate Procedure 32(e) because this brief contains 11,584 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: September 29, 2025

/s/ *Martin De Luca*

Emiliano Martin De Luca
*Counsel for Claimant-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate ACMS system. I certify that all participants in the case are registered ACMS users, and that service will be accomplished by the ACMS system.

/s/ *Martin De Luca*

Emiliano Martin De Luca
*Counsel for Claimant-Appellant*

**SPECIAL APPENDIX**

i

## TABLE OF CONTENTS

**Page**

Memorandum Opinion and Order of the Honorable
Jesse M. Furman, dated June 4, 2025 .................... SPA-1

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
                                         :
                                         :
                                         :                        25-MC-98 (JMF)

IN RE APPLICATION OF YULIA GURYEVA-    :
MOTLOKHOV FOR AN ORDER SEEKING       :        MEMORANDUM OPINION
DISCOVERY PURSUANT TO 28 U.S.C. § 1782    :           AND ORDER
                                         :
                                         :
------------------------------------------------------------------------ X

JESSE M. FURMAN, United States District Judge:

In this case, Applicant Yulia Guryeva-Motlokhov ("Applicant") seeks discovery,

pursuant to 28 U.S.C. § 1782(a), from the Federal Reserve Bank of New York and the Clearing

House Payments Company LLC (together, "Respondents") for use in several foreign judicial

proceedings. *See* ECF No. 1. Specifically, the application seeks "[a]ll documents concerning all

wire transfers" dating to 2019 that reference any of twelve entities and seven people — including

Gaston Browne, the Prime Minister of Antigua and Barbuda — that, according to Applicant,

were involved in the corrupt seizure and sale of a superyacht known as the *Alfa Nero*. *See* ECF

No. 2 ("Applicant's Mem."), at 51; ECF Nos. 4-11, 4-12. By Memorandum Opinion and Order

entered on March 17, 2025, this Court granted Applicant's application on an *ex parte* basis,

albeit "without prejudice to the timely filing of a motion to quash one or both of the subpoenas"

that the Court authorized Applicant to serve. *See* ECF No. 14. Accepting that invitation, some

(but not all) of those referenced in the subpoenas — including Browne — intervened, and they

now move to quash the subpoenas in their entirety. *See* ECF Nos. 21, 30. For the reasons that

follow, the Court GRANTS their motions and quashes the subpoenas in their entirety.

## BACKGROUND

At the heart of this proceeding is the *Alfa Nero*, an eighty-one-meter-long superyacht

once owned by Applicant's father. On August 2, 2022, the United States Office of Foreign

Assets Control ("OFAC") imposed sanctions on Applicant's father — who is purported to be a close associate of Russian President Vladimir Putin, ECF No. 22 ("Browne Mem."), at 5 — and designated the *Alfa Nero* as "blocked property," requesting that it remain in Antigua and Barbuda's territorial waters where it was moored at the time. Applicant's Mem. 6. The High Court of Justice in Antigua subsequently issued an order prohibiting the vessel's removal. *Id.*

In March 2023, media reported that the Antiguan government planned to confiscate and sell the *Alfa Nero*, citing environmental, safety, and security concerns. *See* Applicant's Mem. 7; Browne Mem. 6. Around the same time, the Parliament of Antigua and Barbuda enacted the Port Authority (Amendment) Act, which granted the government authority to declare vessels abandoned and to then seize and sell such vessels. *See* ECF No. 5 ("Hayes Decl."), ¶ 29. In June 2023, OFAC removed the *Alfa Nero* from its list of blocked properties in order to facilitate the Antiguan government's attempt to sell it. *See* Applicant's Mem. 6-7; Browne Mem. 6.

On June 15, 2023, Applicant filed a civil suit in the High Court of the Eastern Caribbean Supreme Court ("Antiguan High Court") challenging the constitutionality of the Port Authority (Amendment) Act. *See* ECF No. 6 ("Getz Decl."), ¶¶ 5-8. Applicant sought but was denied interim injunctive relief to prevent the sale of the *Alfa Nero* pending the Antiguan High Court's judgment. Applicant's Mem. 7-8. In July 2024, the Antiguan government sold the *Alfa Nero* for $40 million to YM Thunder 1 Shipping, Ltd., a company linked to a Turkish businessman named Ali Riza Yildirim. Browne Mem. 7. Trial in the Antiguan High Court took place in November 2024. *Id.* According to the parties, the Court is "due to hand down its judgment regarding the constitutionality of the confiscation and sale of the [*Alfa Nero*] imminently." *See* Getz Decl. ¶ 9.

In March 2025, Applicant initiated civil proceedings in the Commercial Court of the Kaluga Region in the Russian Federation ("Russian Court") against Yilidrim, his son, and

SPA-3

associated entities, including YM Thunder 1 Shipping Ltd., seeking recovery of damages from the purchasers of the yacht.  ECF No. 7 ("Bouiko Decl."), ¶¶ 7-19.  Shortly thereafter, Applicant filed this proceeding, seeking discovery for use in the proceedings pending in Antigua and Russia as well as proceedings that are allegedly contemplated in the United Arab Emirates ("UAE").  ECF No. 1; Applicant's Mem. 38.  By Memorandum Opinion and Order entered on March 17, 2025, this Court granted the application on an *ex parte* basis, albeit "without prejudice to the timely filing of a motion to quash one or both of the subpoenas" that the Court authorized Applicant to serve.  *See* ECF No. 14.  Now pending are two such motions to quash: one filed by Gaston Browne, the Prime Minister of Antigua and Barbuda; three members of Browne's family; four Antiguan companies; the Accountant General of Antigua and Barbuda; and the Director of the Port Authority of Antigua and Barbuda (collectively, "Antiguan Movants"), *see* ECF No. 21; and the second filed by the West Indies Oil Company ("WIOC").  ECF No. 30.

## DISCUSSION

It is well established that "Section 1782 applicants must meet certain 'statutory requirements': (1) the person from whom discovery is sought must reside or be found in the district in which the application was made, (2) the discovery must be 'for use in a foreign proceeding before a foreign tribunal,' and (3) the applicant must be either a foreign tribunal or an 'interested person.'"  *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 128 (2d Cir. 2017) (quoting *Certain Funds, Accts. &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 117 (2d Cir. 2015)).  If those statutory requirements are met, then Section 1782 "authorizes, but does not require, a federal district court" to grant the application.  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004).  In determining whether to exercise that discretion, a district court should consider four factors, commonly known as the "*Intel* factors": (1) whether the person from

3

SPA-4

whom discovery is sought "is a participant in the foreign proceeding"; (2) "the nature of the foreign tribunal" and its "receptivity . . . to U.S. federal-court judicial assistance"; (3) whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions"; and (4) whether the request is "unduly intrusive or burdensome." *Id.* at 264-65; *accord Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 244 (2d Cir. 2018). These factors are "neither exhaustive nor dispositive." *In re Order Seeking Discovery Under 28 U.S.C. § 1782*, No. 24-MC-152 (GHW) (GS), 2024 WL 3569022, at *3 (S.D.N.Y. July 12, 2024), *report and recommendation adopted by* 2024 WL 3567846 (S.D.N.Y. July 29, 2024); *see also Frasers Grp. PLC v. Stanley*, 95 F.4th 54, 58 (2d Cir. 2024) (observing that "[t]he *Intel* factors are not to be applied mechanically" (internal quotation marks omitted)).

Movants here make forceful arguments with respect to the *Intel* factors, but the Court need not and does not reach them because, upon reflection, it concludes that Applicant fails to satisfy the second prerequisite for relief under Section 1782: that the requested discovery is "for use in a proceeding before a foreign tribunal." *Kiobel by Samkalden*, 895 F.3d at 243. The "for use" requirement assesses "the practical ability of an applicant to place a beneficial document — or the information it contains — before a foreign tribunal." *In re Accent Delight*, 869 F.3d at 131. An applicant must both demonstrate that the information is "minimally relevant to the foreign proceeding," *In re BonSens.org*, 95 F.4th 75, 80 (2d Cir. 2024), and identify a "procedural mechanism by which [the applicant] may inject the discovery it seeks," *IJK Palm LLC v. Anholt Servs. USA, Inc.*, 33 F.4th 669, 680 (2d Cir. 2022); *see Certain Funds*, 798 F.3d at 120 ("The key question . . . is not simply whether the information sought is relevant, but whether the [applicant] will actually be able to use the information in the proceeding." (emphasis omitted)). Significantly, "[i]f an applicant's ability to initiate a proceeding in which the

4

requested discovery may be used 'depends on some intervening event or decision,' the applicant must 'provide an objective basis on which to conclude that the event will occur.'" *In re BonSens.org,* 95 F.4th 75, 80-81 (2d Cir. 2024) (quoting *IJK Palm LLC*, 33 F.4th at 680).

The three proceedings that Applicant invokes — the proceedings already pending in Antigua and Russia and the proceedings allegedly contemplated in the UAE — fail to meet these standards.  The Court will address each in turn.

## A.  The Antiguan Proceedings

First, the pending Antiguan proceedings fall short because Applicant has failed to identify any procedural mechanism to "inject" the requested discovery into those proceedings at this time — or any time in the near future.  As noted, the trial before the Antiguan High Court has already concluded, and that Court "is due to hand down its judgment . . . imminently."  Getz. Decl. ¶ 9.  Significantly, Applicant does not even try to argue that she would be able to place the records at issue before the Antiguan High Court itself at this stage of the proceedings.  Instead, in the words of her own foreign law expert, she hopes to use the records in an *appeal* that she "*intends*" to bring "[*i*]*f* the [Antiguan High Court's] Judgment is unfavorable." *Id.* ¶ 10 (emphases added).  "[A]t this stage of the proceeding," however, there is "no 'objective basis' from which" the Court can conclude that the Antiguan High Court's decision will be "unfavorable" to Applicant, let alone that the records at issue would be relevant to the particular issue or issues in an appeal from such a decision.  *In re BonSens.org*, 95 F.4th at 81.

Perhaps recognizing that flaw in her request, Applicant asserts in her memoranda of law that the requested discovery would be used in the Antiguan proceeding even if the Antiguan High Court were to rule in her favor, as she would use it to enforce the judgment and seek compensation in the form of the sale proceeds.  *See* Applicant's Mem. 49; ECF No. 41

5

("Applicant's Opp'n"), at 22. But without further explanation from her foreign law expert, this assertion alone is too "conclusory," *In re Postalis*, No. 18-MC-497 (JGK), 2018 WL 6725406, at *4 (S.D.N.Y. Dec. 20, 2018), and does "not adequately explain[] . . . how" wire transfer records dating back to 2019 would help her recover proceeds from a sale that took place in 2024, *In re Lloreda*, 323 F.Supp.3d 552, 558 (S.D.N.Y. 2018). Moreover, the assertion is hard to even credit given the Movants are not defendants in the Antiguan proceedings.

In short, Applicant has not demonstrated that the requested discovery is "for use" in the Antiguan proceedings given the current posture of those proceedings.

**B. The Russian Proceedings**

Nor do the ongoing Russian proceedings satisfy the "for use" requirement. In those proceedings, Applicant seeks damages from the purchasers of the *Alfa Nero* on the ground that the purchase was "unfair" under Russian law because it was done "in accordance with sanctions imposed by 'unfriendly' states," namely the United States. Bouiko Decl. ¶ 15. But the subpoenas do not even mention the purchasers. *See* ECF Nos. 4-11, 4-12. Applicant contends that the records she seeks may help her prove that the sale of the *Alfa Nero* was part of a broad corruption scheme, may confirm "the identities of the purchasers," and may aid her in "identifying related transactions, [or] uncovering any ongoing financial connections between Browne and the alleged purchasers," Applicant's Opp'n 14-15, but she fails to show that any of that is relevant to the sole issue in the Russian proceedings: whether the vessel's purchase was "in accordance" with U.S. sanctions.[1] In short, Applicant's discovery request "appears to be

---

[1]    Additionally, even if the records at issue could be used in the Russian proceedings, the Court agrees with the Antiguan Movants that "the nature of those proceedings strongly militates against permitting discovery" in the United States, as the goal of those proceedings is to undermine U.S. sanctions. ECF No. 45 ("Antiguan Movants' Reply"), at 9 (citing *Intel Corp*, 542 U.S. at 264). "No U.S. court should aid such a pursuit." *Id.*

6

SPA-7

little more than a fishing expedition to acquire documents and information that have at best limited relevance" to the Russian proceedings. *In re Lloreda*, 323 F. Supp. 3d at 559.

**C. The Contemplated Proceedings in the UAE**

Finally, the Court concludes that any future criminal proceeding in the UAE is not sufficiently "within reasonable contemplation," *Intel Corp.*, 542 U.S. at 259, to satisfy the "for use" requirement. To show that a proceeding is "within reasonable contemplation," an applicant must provide "reliable indications of the likelihood that proceedings will be instituted within a reasonable time." *Certain Funds*, 798 F.3d at 124. Contemplated "proceedings cannot be merely speculative"; "[a]t a minimum, [an] applicant must present to the district court some concrete basis from which it can determine that the contemplated proceeding is more than just a twinkle in counsel's eye." *Id.* at 124. Significantly, courts have held that where "the most [an applicant] appears able to do is to forward the evidence [she] obtains to [a foreign criminal authority], which, exercising its discretion, will decide whether to initiate a formal criminal prosecution," the "for use" requirement is not met. *In re Klein*, No. 23-MC-211 (PAE), 2023 WL 8827847, at *9 (S.D.N.Y. Dec. 21, 2023), *aff'd sub nom. Klein v. Altara RK Invs. Ltd.*, 2025 WL 560105 (2d Cir. Feb. 20, 2025) (summary order); *see, e.g.*, *IJK Palm LLC*, 33 F.4th at 678 ("[D]iscovery material is not 'for use' in a foreign proceeding if it must first be used to persuade a third party to initiate that proceeding.").

Measured against these standards, the potential proceedings in the UAE are far too speculative to support Applicant's request. For starters, Applicant's own foreign law expert concedes that the discovery "will allow Applicant to determine *whether and how* Browne, *possibly* with the assistance of others, executed a self-interested seizure and sale of the vessel." ECF No. 8 ("Gunson Decl."), ¶ 12 (emphases added). Moreover, even if she finds evidence to

7

support her suspicions, she could not submit it to a court.  Instead, she would "file[] [it] with the UAE Federal Public Prosecution," which, in turn, would investigate only "[*i*]*f* the petition is deemed admissible." *Id.* ¶ 8 (emphasis added).  "*If* sufficient evidence is found," Applicant's foreign law expert continues, "the UAE Federal Public Prosecution *may* proceed with formal charges." *Id.* (emphasis added).  This lengthy chain of contingencies makes plain that there is no "concrete basis from which [the Court] can determine" that a proceeding in the UAE in which Applicant could make use of the requested discovery "is more than just a twinkle in counsel's eye." *Certain Funds*, 798 F.3d at 124.  As in *In re Klein*, No. 23-MC-211 (PAE), 2023 WL 8827847 (S.D.N.Y. Dec. 21, 2023), the most it appears she could do is "forward the evidence" to the prosecution, "which, exercising its discretion, will decide whether to initiate a formal criminal proceeding." *Id.* at *9.  That does not suffice.

Nor do the cases upon which Applicant relies compel a different conclusion.  *See* Applicant's Opp'n 15-16.  In *In re Byrne*, No. 23-MC-048 (VEC), 2023 WL 3203811 (S.D.N.Y. May 2, 2023), for example, the applicant was seeking discovery relevant to an already-pending civil proceeding in addition to a contemplated criminal proceeding. *See id.* at *5.  To the extent that the court relied on the contemplated criminal proceeding, the court acknowledged that the petitioner attested that he intended to file a criminal complaint "as soon as reasonably possible" and was only "await[ing] discovery" from the Section 1782 petition "to provide *further* evidence of the Liable Parties' criminal" actions, *id.* (emphasis added) — representations that Applicant has not made (and likely cannot make) here, *see* Gunson Decl. ¶ 10 (stating that Applicant will pursue criminal proceedings "once she has sufficient evidence to persuade [UAE authorities] that a prosecution will be successful").  And *Dannacher v. Cloudflare, Inc.*, No. 24-MC-80066 (SK), 2024 WL 2875097 (N.D. Cal. May 23, 2024), involved an *ex parte* application, with the "for

8

use" requirement receiving no substantive analysis. *See id.* at *3 (addressing all statutory requirements in a single sentence). Further, the district court noted that the Dubai Police Station had already opened an investigation of the underlying events at issue. *See id.* Here, by contrast, there is no open investigation. Instead, criminal proceedings in the UAE are no more than "purely hypothetical." *In re Harbour Victoria Inv. Holdings Ltd. Section 1782 Petitions*, No. 15-MC-127 (AJN), 2015 WL 4040420, at *8 (S.D.N.Y. June 29, 2015) (Nathan, J.).

## CONCLUSION

For the foregoing reasons, the Court concludes that Applicant has not satisfied the "for use" statutory requirement for relief under Section 1782. Accordingly, Movants' motions to quash the subpoenas must be and are GRANTED, and the Court's Memorandum Opinion and Order entered on March 17, 2025, which had granted Applicant's application on an *ex parte* basis is VACATED. (The Clerk of Court can and should leave it on the docket, however, as it is part of the record in this matter.)

To be clear, the subpoenas are quashed in their entirety, notwithstanding the fact that only some of those referenced in the subpoenas have appeared and sought relief. That is because Movants' arguments demonstrate that Applicant failed to meet the statutory requirements for relief in the first instance; given that, and given that the Court granted the application on an *ex parte* basis without the benefit of adversarial testing, it would be inappropriate to allow the subpoenas to stand at all. Finally, Applicant and Movants shall promptly confer with respect to what should be done with any discovery that Applicant has already received in connection with the now-quashed subpoenas and, **within two weeks of the date of this Opinion and Order**, file an agreed-upon proposed order (or competing orders, with a redline showing the differences, and letter briefs not to exceed three pages).

9

The Court's decision is without prejudice to a new application for relief under Section 1782 in the event that circumstances change materially (for example, in the Antiguan proceedings) and Applicant is able to satisfy the second statutory requirement. *See In re Application of BonSens.org for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding*, 22-MC-352, ECF No. 26 (S.D.N.Y. Feb. 14, 2023), *aff'd*, 95 F.4th 75. In the event that Applicant files a new application, she shall mark it as related to this case.

The Clerk of Court is directed to terminate ECF Nos. 21 and 30; to conform the docket to the caption on this Memorandum Opinion and Order; and to close the case.

SO ORDERED.

Dated: June 4, 2025
New York, New York

_____
JESSE M. FURMAN
United States District Judge

10